IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CONSUMER WATCHDOG, individually and on behalf of the general public,** 413 E. Capitol, St. SE, First Floor, Washington, D.C. 20003, <br><br> **Plaintiff,** <br><br> v. <br><br> **ZOOM VIDEO COMMUNICATIONS, INC.** 55 Almaden Boulevard, 6th Floor, San Jose, California 95113, <br><br> **Defendant**. | Case No: _____ <br><br> (Removed from the Superior Court of the District of Columbia Civil Action No. 2020 CA 003516 B (SFM)) |

# EXHIBIT A
# Complaint, Civil Information Sheet, Summons, and Initial Order Served on Zoom

Filed
D.C. Superior Court
08/10/2020 19:58PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| CONSUMER WATCHDOG, individually and on behalf of the general public, 413 E. Capitol St., SE, First Floor, Washington, D.C. 20003, | Case No.: **2020 CA 003516 B** |
| *Plaintiff,* | |
| v. | **JURY TRIAL DEMANDED** |
| ZOOM VIDEO COMMUNICATIONS, INC., a Delaware corporation, 55 Almaden Boulevard, 6th Floor, San Jose, California 95113, | |
| *Defendant.* | |

## <u>COMPLAINT</u>

Plaintiff Consumer Watchdog ("Plaintiff" or "Consumer Watchdog") brings this Complaint and Demand for Jury Trial on behalf of the general public against Defendant Zoom Video Communications, Inc. ("Defendant" or "Zoom") for making false and deceptive representations to consumers about its data security practices in violation of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.* Plaintiff, for its Complaint, alleges as follows:

### NATURE OF THE ACTION

1.    As the number of reported data breaches and privacy incidents continues to soar, consumers are making data security a crucial consideration when choosing which companies to do business with and which products to buy. In fact, according to a recent Harris Poll survey, data security is "not just an under-the-hood operational function, it is part of how companies are

judged in the consumer marketplace."[1] Many businesses are therefore investing in data security

technologies and distinguishing themselves by offering stronger data security features than their

competitors. According to Jay Cline, the United States ("U.S.") Privacy Leader at

PricewaterhouseCoopers, "[m]arkets are ready to be disrupted by companies who can get this

right[.]"[2]

2.      Zoom is positioned within an extremely saturated workplace collaboration

market. To distinguish itself from competitors and attract new customers, Zoom began

advertising and touting its use of a strong security feature called "end-to-end encryption" to

protect communications on its platform, meaning that the *only* people who can access the

communicated data are the sender and the intended recipient. Using end-to-end encryption

prevents unwanted third parties—including the company that owns the platform (in this case,

Zoom)—from accessing communications, messages, and data transmitted by users.

3.      In certain industry sectors, this level of data security is not just desired, but also

necessary to protect vulnerable populations and comply with regulatory privacy laws. For

example, the healthcare industry takes particular care in selecting communication platforms that

are secure enough to comply with the Health Insurance Portability and Accountability Act

("HIPPA").

4.      Zoom repeated its end-to-end encryption claims throughout its website, in white

papers—including in its April 2020 HIPAA Compliance Guide—and on the user interface within

---

[1]      IBM, *IBM Cybersecurity and Privacy Research*,
https://newsroom.ibm.com/Cybersecurity-and-Privacy-Research (last accessed Aug. 10, 2020).

[2]      N.F. Mendoza, *Data privacy: What consumers want businesses to know*, TechRepublic,
https://www.techrepublic.com/article/data-privacy-what-consumers-want-businesses-to-know/
(last accessed Aug. 10, 2020).

the app. Through these representations, Zoom established itself as a safe, secure, and reliable video conferencing platform for consumers, and targeted sectors that require highly secure communication systems.

5.      Further, there is no question that consumers—and businesses in the healthcare sector—have specifically relied on Zoom's false end-to-end encryption representations. For example, one large telehealth company explained its decision to deliver its services through Zoom's platform as follows:

> Zoom offers an end-to-end encryption which is leveraged during communication . . . [Company] inherits this encryption during all video conferencing between patients and Care Team personnel. [Company] ensures that the end-to-end encryption is enabled as part of the package for the Remote Patient Monitoring, designed to facilitate HIPAA based compliance requirements.

6.      Unfortunately, Zoom's claims that communications on its platform were end-to-end encrypted were false. Zoom only used the phrase "end-to-end encryption" as a marketing device to lull consumers and businesses into a false sense of security.

7.      The reality is that Zoom is, and has always been, capable of intercepting and accessing any and all of the data that users transmit on its platform—the very opposite of end-to-end encryption. Nonetheless, Zoom relied on its end-to-end encryption claim to attract customers and to build itself into a publicly traded company with a valuation of more than $70 billion.

8.      By falsely promising consumers that their video calls would be protected with end-to-end encryption, Zoom blatantly violated the CPPA, D.C. Code § 28-3904, which prohibits unlawful and deceptive trade practices.

9.      To make matters worse, numerous reports suggest that while Zoom holds itself out as an American company, it nonetheless maintains servers in China, has meaningful ties to the People's Republic of China, currently employs more than 700 employees in China that work

in "research and development[,]" and may have disclosed its American users' sensitive personal information to the Chinese government.[3] In fact, U.S. Senators Richard Blumenthal (D-Conn.) and Josh Hawley (R-MO.) have recently urged the Department of Justice ("DOJ") to investigate Zoom for reported violations of Americans' civil liberties, as well as the national security implications of its relationships with the People's Republic of China.[4]

10.    Accordingly, Plaintiff brings this suit on behalf of the general public and the tens of thousands of District of Columbia ("D.C.") consumers to seek redress for Zoom's unlawful and deceptive conduct. Plaintiff seeks civil penalties, restitution, and all necessary, appropriate, and available equitable and injunctive relief to address, remedy, and prevent harm to D.C. residents resulting from Zoom's misconduct.

## PARTIES

11.    Plaintiff Consumer Watchdog is a 501(c)(3) non-profit, public benefit corporation with offices in Washington, D.C., located at 413 E. Capitol St., SE, First Floor, Washington, D.C. 20003 and California, located at 6330 South San Vicente Blvd Suite 250, Los Angeles, California 90048. Consumer Watchdog is a nationally recognized non-partisan, non-profit corporation dedicated to representing the interests of taxpayers and consumers through advocating and fighting false advertising and corporate deception, and protecting consumers' online data security and privacy.

12.    Defendant Zoom is a corporation existing under the laws of the State of Delaware,

---

[3]    *Move Fast and Roll Your Own Crypto: A Quick Look at the Confidentiality of Zoom Meetings*, https://citizenlab.ca/2020/04/move-fast-roll-your-own-crypto-a-quick-look-at-the-confidentiality-of-zoom-meetings/ (last accessed Aug. 10, 2020).

[4]    U.S. Senators Richard Blumenthal and Josh Hawley, *Letter to Assistant Attorney General John C. Demers*, https://www.blumenthal.senate.gov/imo/media/doc/07.30.20%20-%20DOJ%20-%20China%20Investigations.pdf (last accessed Aug. 10, 2020)

with its headquarters and principal place of business located at 55 Almaden Boulevard, 6th

Floor, San Jose, California 95113. Zoom conducts business throughout Washington, D.C.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Defendant pursuant to D.C. Code

§§ 11-921 and 28-3905.

14.     This Court has personal jurisdiction over Defendant pursuant to D.C. Code § 13-

423 because Zoom conducts significant business in D.C., solicits contracts in D.C., enters into

contracts to supply services in D.C., and because the unlawful conduct causing injury alleged in

this Complaint occurred by its acts and omissions in D.C.

## FACTUAL BACKGROUND

I.      **Zoom's Business Model and Recent Success.**

15.      Zoom is a publicly traded company that provides remote video conferencing

services for businesses and individuals.

16.     While based in San Jose, California, the company also has sales and account

management employees in other cities around the U.S. and the world, including Washington,

D.C. The company also markets its services to individuals in D.C. and provides services to tens

of thousands of D.C. residents.

17.     Founded in 2011, the company grew its user base over the course of several years

and achieved a $1 billion valuation by 2017. Zoom went public on the NASDAQ in March 2019

and, at the end of its initial public offering, was valued at just under $16 billion. Zoom is

currently valued at over $70 billion.

18.     By January 2020, Zoom had attracted millions of users to its service platform,

which can be accessed through users' laptops, desktops, and the Zoom mobile app for Apple and

Android devices.

19.     In recent months, Zoom's use among consumers has skyrocketed in conjunction with the national response to the COVID-19 pandemic. According to CNBC, Zoom's user base has grown to 12.92 million monthly active users, a twenty-one (21) percent increase since the end of 2019.[5]

20.     As Zoom's user base has grown, so has its valuation. Since February 21, 2020— when many other stocks started to crash as the pandemic became more severe—Zoom's stock has more than doubled in value.[6]

21.     Zoom users have—as relevant here—two options for how to use the app. They may use the free version of Zoom, which places a forty-minute limit on the maximum duration of a video conference, among other restrictions. Otherwise, they may use Zoom through one of several paid plans, which contain fewer limits and additional features, for prices ranging from $14.99 per month to $19.99 per month.[7] (Zoom also provides a variety of other paid options as well, including a healthcare-focused version for $200 per month.)

22.     Zoom's growth in popularity has seen an increased focus on the platform's security, as many public and private organizations are using Zoom to communicate and conduct day-to-day business. Recent media reports have described a growing trend of "Zoombombing[,]" in which third parties obtain the credentials to join a Zoom call in order to disrupt the call by,

---

[5]     Jordan Novet, *Zoom has added more videoconferencing users this year than in all of 2019 thanks to coronavirus, Bernstein says*, https://cnb.cx/2WWnewd (last accessed Aug. 10, 2020).

[6]     Jeremy Bowman, *Is It Too Late to Buy Zoom Video Communications Stock?*, The Motley Fool, https://www.fool.com/investing/2020/06/16/is-it-too-late-buy-zoom-video-communications-stock.aspx (last accessed Aug. 10, 2020).

[7]     Zoom, *Zoom Meeting Plans for Your Business*, https://zoom.us/pricing (last accessed Aug. 10, 2020).

*e.g.*, depicting swastikas and making racially offensive comments.[8]

23.     However, these problems pale in comparison to a core deficiency in Zoom's

security—one that remains in place to this day and which the company has itself acknowledged.

## II.     Zoom Promised End-To-End Encryption of Video Calls But Didn't Provide It.

24.     Consistently and across multiple mediums, Zoom has claimed that its video

conferencing platform supported "end-to-end encryption[.]" It has said this in a Security White

Paper published in June 2019, as well as on its website since at least October 28, 2018.[9] It has

highlighted how "end-to-end encrypted Zoom allows" a federal regulatory authority to work

securely while using the platform.[10] And it has even suggested that, at least as to its healthcare-

focused clients, for "video conferencing, the . . . security architecture must provide end-to-end

encryption and meeting access controls so data in transit cannot be intercepted."[11] (*See also*

Figures 1, 2, and 3.)

---

[8]     Salvador Hernandez, *A Zoom Meeting For Women Of Color Was Hijacked By Trolls Shouting The N-Word*, BuzzFeed News, https://bit.ly/2R1C8NG (last accessed Aug. 10, 2020).

[9]     Zoom, *Security at Zoom*, https://zoom.us/security (last accessed July 30, 2020) ("The following in-meeting security capabilities are available to the meeting host . . . Secure a meeting with encryption[.]"); Zoom, *Zoom Meetings & Chat*, https://web.archive.org/web/20181028201834/https://www.zoom.us/meetings (last accessed August 10, 2020 via Internet Archive).

[10]     Rena Gadimova, *End-to-End Encrypted Zoom Allows FINRA to Maintain a High-Security Posture*, Zoom Blog https://bit.ly/3dJIfJy (last accessed Apr. 10, 2020). (Article's name has since been changed to "Zoom Allows FINRA to Maintain a High-Security Posture" (last accessed Aug. 10, 2020).)

[11]     Zoom, *HIPAA Compliance Guide*, https://web.archive.org/web/20200401043011/https://zoom.us/docs/doc/Zoom-hipaa.pdf (last accessed July 30, 2020 via Internet Archive); *see also* 45 CFR §§ 164.312(a)(2)(iv), (e)(2)(ii).

## Protecting your Meetings

The following in-meeting security capabilities are available to the meeting host:

* Secure a meeting with **end**-to-**end** encryption

**(Figure 1.)**

## Enables HIPAA, PIPEDA & PHIPA Compliance

Zoom's solution and security architecture provides end-to-end encryption and meeting access controls so data in transit cannot be intercepted.

**(Figure 2.)**

 Meet securely

End-to-end encryption for all meetings, role-based user security, password protection, waiting rooms, and place attendee on hold.

**(Figure 3.)**

25.     The company's claim of providing end-to-end encryption was false.

26.    "[E]nd-to-end encryption" is defined in Federal Standard 1037 (superseded by American National Standard T1.523-2001) as "[t]he encryption of information at its origin and decryption at its intended destination without any intermediate decryption."[12]

27.    With end-to-end encryption, data passes through the service provider's intermediate servers, but encryption and decryption are handled strictly by the parties of the communication. Therefore, the parties' communications are kept private from not only outside attackers, but also from the service provider itself. (*See* **Figure 4**.)



**End-to-End Encryption**

Encrypted

Intermediary Can't Decrypt

**(Figure 4.)**

28.    Instead of using end-to-end encryption as explicitly advertised, Zoom uses what is known as "transport encryption" or "Transport Layer Security" ("TLS") where data transmitted over the service must also pass through Zoom's servers—but now can be read and/or collected by Zoom itself. As described by a recent article in *The Intercept*, "[t]he encryption that Zoom uses to protect meetings is TLS, the same technology that web servers use to secure HTTPS websites."[13] While TLS can be used to protect communications in transit between a party and

---

[12]    These standards provide departments and agencies of the Federal government with a comprehensive source of definitions for various telecommunications related terms.

[13]    Micah Lee & Yael Grauer, *Zoom Meetings Aren't End-To-End Encrypted, Despite Misleading Marketing*, Intercept, https://theintercept.com/2020/03/31/zoom-meeting-encryption/ (last accessed Aug. 10, 2020).

Zoom's servers from attackers, it does not prevent Zoom from decrypting and accessing the communications' content as it passes though Zoom's intermediate servers. (*See* **Figure 5**.)

**Transport Encryption**



Intermediary Can Decrypt

**(Figure 5.)**

29.     The difference between "end-to-end" and "transport" encryption is significant. Users on Zoom's platform utilize the service with the belief that no one outside of an individual video conference session can see or hear the information being transmitted or otherwise learn about the conference. Given that individuals and companies use Zoom to discuss and share confidential trade secrets, it is particularly troubling that Forbes recently reported that some Zoom conversations were being routed through servers in China—a country whose government is often accused of trade secret theft.[14] In fact, U.S. Senators Richard Blumenthal (D-Conn.) and Josh Hawley (R-MO.) have recently urged the Department of Justice to open an official investigation into Zoom over its reported violations of American civil liberties, including reports that it may have disclosed private information about Americans to the People's Republic of China.[15]

---

[14]     Thomas Brewster, *Warning: Zoom Makes Encryption Keys In China (Sometimes)*, Forbes, https://www.forbes.com/sites/thomasbrewster/2020/04/03/warning-zoom-sends-encryption-keys-to-china-sometimes/#71d359a53fd9 (last accessed Aug. 10, 2020).

[15]     *Supra* n.4.

30.     Therefore, Zoom's advertised end-to-end encryption feature was particularly important given that many (in D.C. and elsewhere) are now spending significant amounts of personal time communicating over Zoom and sharing sensitive information on the platform. Security is thus of paramount concern, and many customers using Zoom's free and paid services have used the platform without knowing that Zoom can monitor transmissions on the back end.

31.     Notably, in response to *The Intercept* article, Zoom *admitted* that its encryption is not truly end-to-end. Zoom's Chief Product Officer Oded Gal later wrote a blog post in which he apologized on behalf of the company "for the confusion we have caused by incorrectly suggesting that Zoom meetings were capable of using end-to-end encryption."[16]

32.     Zoom's admission—and its platform's shortcoming—is even more striking because end-to-end encryption *could* have been set up for a video conferencing platform like Zoom. For instance, Apple's FaceTime application uses end-to-end encryption. As a Johns Hopkins University computer science professor noted to *The Intercept*, "if it's all end-to-end encrypted, you need to add some extra mechanisms to make sure you can do that kind of 'who's talking' switch, and you can do it in a way that doesn't leak a lot of information. You have to push that logic out to the endpoints . . . It's doable."

33.     These promises for enhanced platform security come only after facing backlash over its falsely advertised claims of end-to-end encrypted video conferencing. Upon information and belief, Zoom has been warned of its platform's deficiencies by privacy advocates. As the Center for Democracy and Technology's former Privacy & Data Project Director Michelle De Mooy recently stated, she and others "have spoken to Zoom over the past few years and made

---

[16]     Oded Gal, *The Facts Around Zoom and Encryption for Meetings/Webinars*, Zoom Blog https://bit.ly/3dVwJBX (last accessed July 30, 2020).

them aware of glaring privacy and security concerns that they did little to correct."[17]

34.   Following revelations surrounding Zoom's security deficiencies, many entities began preventing its use. New York City—despite being the nation's largest COVID-19 hotspot *and* largest school district by enrollment—forbid the use of Zoom for remote learning.[18] The New York Attorney General has similarly raised concerns about Zoom's privacy practices and started to investigate.[19] Even Elon Musk's "rocket company SpaceX has banned its employees from using video conferencing app Zoom, citing 'significant privacy and security concerns[.]'"[20]

**THE INTERESTS OF CONSUMER WATCHDOG & THE GENERAL PUBLIC**

35.   Plaintiff Consumer Watchdog acts for the benefit of the General Public as a private attorney general pursuant to D.C. Code § 28-3905(k)(1).

36.   Since 1985, Consumer Watchdog has worked diligently representing the interests of consumers through advocating and fighting against corporate deception and false advertising. A core focus of Consumer Watchdog's advocacy is its Privacy and Technology project, which seeks to protect consumers' online privacy and enable consumers to regain control over data about them.[21]

37.   Plaintiff focuses its efforts on consumer protection and advocacy, including

---

[17]   Michelle De Mooy, LinkedIn; *Michelle De Mooy*, Ctr. for Democracy & Tech., https://cdt.org/staff/michelle-de-mooy/ (last accessed Apr. 6, 2020).

[18]   Alex Zimmerman, *NYC forbids schools fromuUsing Zoom for remote learning due to privacy and security concerns*, Chalkbeat, https://bit.ly/2JKazEM (last accessed Aug. 10, 2020).

[19]   Danny Hakim & Natasha Singer, *New York Attorney General Looks Into Zoom's Privacy Practices*, https://nyti.ms/2Rgo2s3 (last accessed Aug. 10, 2020).

[20]   Munsif Vengattil & Joey Roulette, *Elon Musk's SpaceX Bans Zoom Over Privacy Concerns –Memo*, https://reut.rs/2JF78z4 (last accessed July 30, 2020).

[21]   *See* Consumer Watchdog, Privacy and Technology, https://www.consumerwatchdog.org/privacy-technology (last accessed Aug. 10, 2020).

efforts to ensure the safe and secure use of online services and platforms.

38.     Upon information and belief, tens of thousands of D.C. residents use Zoom regularly for video conferencing and communication.

39.     Seeking to tap into increased consumer demand for private and secure forms of online communication, Zoom falsely advertised end-to-end encryption as a standard security feature for its video conferencing service.

**CAUSE OF ACTION**
**Violations of the D.C. Consumer Protection Procedures Act**
**(On Behalf of the General Public and D.C. Consumers)**

40.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

41.     This Count is brought by Consumer Watchdog on behalf of the General Public and D.C. consumers pursuant to D.C. Code §§ 28-3905(k)(1)(C) and (D).

42.     Pursuant to D.C. Code § 28-3905(k)(1)(C), "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District[.]"

43.     Pursuant to D.C. Code § 28-3905(k)(1)(D), "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice."

44.     The CPPA is a remedial statute that is to be broadly construed. Its purpose is to assure that a just mechanism exists to remedy all improper trade practices and in order to deter the continuing use of such practices.

45.     D.C. Code § 28-3904 prohibits any person from engaging in unfair and deceptive, "whether or not any consumer is in fact misled, deceived, or damaged thereby," including by:

(a)     "represent[ing] that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have[,]" *id.* § 28-3904(a);

(b)     "represent[ing] that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another[,]" *id.* § 28-3904(d);

(c)     "misrepresent[ing] as to a material fact which has a tendency to mislead[,]" *id.* § 28-3904(e);

(d)     "fail[ing] to state a material fact if such failure tends to mislead[,]" *id.* § 28-3904(f);

(e)     us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead[,]" *id.* § 28-3904(f-1); and

(f)     "advertis[ing] or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered[,]" *id.* § 28-3904(h).

46.     The CPPA's jurisdiction extends beyond the unlawful trade practices listed in D.C. Code § 28-3904 to practices that are prohibited by any statute, regulation, common law, or other law of the District of Columbia.

47.     Merchants who violate the CPPA may be recover treble damages, or $1,500 per violation, whichever is greater, payable to the consumer; attorney's fees; punitive damages; an injunction; and, in representative actions, any additional relief as necessary to restore to the consumer money or property. D.C. Code §§ 28-3905(k)(2)(A)-(E).

48.     Zoom is a merchant because, in the ordinary course of its business, it sells and supplies consumer services directly to consumers and its video communication service is a

14

consumer service within the meaning of D.C. Code § 28-3901(a)(7).

49.     Zoom has engaged in conduct that constitutes unlawful and deceptive trade practices by making deceptive representations about the nature of the encryption provided for video communications on its platform to the public, including to D.C. residents, and falsely claiming that it provided end-to-end encryption. D.C. Code §§ 28-3904(a), (d)-(f-1), (h). False claims about data security and encryption are routinely found to be deceptive, including by the Federal Trade Commission. *See, e.g.*, *In the Matter of James V. Grago, Jr., individually and d/b/a ClixSense.com*, 2019 WL 1932143, at *1 (F.T.C. April 24, 2019).

50.     Zoom's statements about the security and privacy of its services—including statements claiming that it provided end-to-end encryption and that its security architecture prevents data and communications from being intercepted—are material and have the tendency to mislead consumers and are unlawful trade practices that violate the CPPA, D.C. Code § 28-3904(f-1).

51.     Zoom intended that the public, including D.C. residents, rely on its deceptive claims and representations regarding the security of communications on its platform.

52.     Rather than provide the level of encryption it publicly and repeatedly promised, Zoom chose to provide something less: a video communication platform where communications can be viewed, accessed, and disclosed by Zoom at any time.

53.     Although reliance is not required by the CPPA, consumers have nevertheless reasonably relied on Defendant's uniform misrepresentations and omissions when using and purchasing its video communication service.

54.     Accordingly, Plaintiff seeks all damages available at law, including statutory damages to each and every D.C. consumer who used and/or purchased access to Zoom's video

communication service, injunctive relief prohibiting Zoom from misrepresenting its privacy and

security policies, reasonable attorneys' fees and costs, and such other relief as deemed

appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Consumer Watchdog, individually and in its representative

capacity on behalf of the general public and the interests of D.C. consumers, prays for the

following relief:

(A)     Declare that Defendant's actions, as described herein, violate the D.C. Consumer

Protection Procedures Act, D.C. Code §§ 28-3904(a), (d)-(f-1), (h);

(B)     Award all appropriate injunctive relief as necessary to protect the interests of

Plaintiff, the interests of consumers, and the General Public, including, among other things, an

order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

(C)     Award damages including:

   i.     the greater of (a) treble damages, or (b) statutory damages in the amount

          of $1,500 per violation, pursuant to D.C. Code § 28-3905(k)(2)(A);

   ii.    additional relief as may be necessary to restore consumer money or

          property, real or personal, which may have been acquired by means of

          Defendant's unlawful trade practice, pursuant to D.C. Code § 28-

          3905(k)(2)(E); and

   iii.   Punitive damages, where applicable, to Plaintiff, the general public, and a

          class of D.C. Consumers in an amount determined at trial, pursuant to

          D.C. Code § 28-3905(k)(2)(C);

(D)     Award Plaintiff reasonable litigation expenses and attorneys' fees, pursuant to

D.C. Code § 28-3905(k)(2)(B);

(E)     Award Plaintiff and members of the General Public pre- and post-judgement

interest to the extent allowable; and

(F)     Award such other and further relief as equity and justice may require, pursuant to

D.C. Code § 28-3901(k)(2)(F).

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**CONSUMER WATCHDOG**, individually and on behalf of the general public,

Dated: August 10, 2020

By:/s/  Harvey Rosenfield
One of Plaintiff's Attorneys

Harvey Rosenfield
harvey@consumerwatchdog.org
CONSUMER WATCHDOG
413 E. Capitol St., SE, First Floor
Washington, D.C. 20003
D.C. Bar No. 295915

*Jerry Flanagan
jerry@consumerwatchdog.org
*Benjamin Powell
ben@consumerwatchdog.org
CONSUMER WATCHDOG
6330 San Vicente Blvd., Suite 250
Los Angeles, California 90048
Tel: 310.392.0522

*Jay Edelson
jedelson@edelson.com
*Ari J. Scharg
ascharg@edelson.com
*Theo J. Benjamin
tbenjamin@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor

Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Admission *pro hac vice* to be sought

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

CONSUMER WATCHDOG, individually and on behalf of the general public,

413 E. Capitol St., SE, First Floor, Washington, D.C. 20003

vs

ZOOM VIDEO COMMUNICATIONS, INC., a Delaware corporation,

55 Almaden Boulevard, 6th Floor, San Jose, California 95113

Case Number: **2020 CA 003516 B**

Date: August 10, 2020

☐ One of the defendants is being sued in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* Harvey Rosenfield | Relationship to Lawsuit |
| Firm Name: Consumer Watchdog | ☒ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.: (310) 392-0522    Six digit Unified Bar No.: 295915 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury    ☐ 6 Person Jury    ☒ 12 Person Jury

Demand: $ Restitution and Civil Penalties    Other: Injunctive Relief

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____    Judge: _____    Calendar #: _____

Case No.: _____    Judge: _____    Calendar#: _____

---

NATURE OF SUIT:    *(Check One Box Only)*

**A. CONTRACTS**                          **COLLECTION CASES**

☐ 01 Breach of Contract        ☐ 14 Under $25,000 Pltf. Grants Consent    ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty        ☐ 17 OVER $25,000 Pltf. Grants Consent    ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument     ☐ 27 Insurance/Subrogation                ☐ 26 Insurance/Subrogation
☐ 07 Personal Property              Over $25,000 Pltf. Grants Consent          Over $25,000 Consent Denied
☐ 13 Employment Discrimination ☐ 07 Insurance/Subrogation                ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees         Under $25,000 Pltf. Grants Consent          Under $25,000 Consent Denied
                               ☐ 28 Motion to Confirm Arbitration
                                   Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile              ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion              ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process          ☐ 10 Invasion of Privacy              ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection   ☐ 11 Libel and Slander                     Not Malpractice)
☐ 03 Assault and Battery       ☐ 12 Malicious Interference           ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution         ☐ 19 Wrongful Eviction
☒ 05 Deceit (Misrepresentation) ☐ 14 Malpractice Legal              ☐ 20 Friendly Suit
☐ 06 False Accusation          ☐ 15 Malpractice Medical (Including Wrongful Death) ☐ 21 Asbestos
☐ 07 False Arrest              ☐ 16 Negligence- (Not Automobile,     ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                          Not Malpractice)                 ☐ 23 Tobacco
                                                                    ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants
      (DC Code § 11-941)
- [ ] 10  Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment

- [ ] 17 Merit Personnel Act (OEA)
      (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability

- [ ] 24 Application to Confirm, Modify,
      Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

## II.

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
      Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
      Judgment [ D.C. Code §
      2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code §
      42-3301, et seq.)

- [ ] 21 Petition for Subpoena
      [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1)
      (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

## D.  REAL PROPERTY

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)

- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

August 10, 2020
_____
Date

CV-496/ June 2015



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

CONSUMER WATCHDOG, individually and on behalf of the general
public,
413 E. Capitol St., SE, First Floor, Washington, D.C. 20003        Plaintiff

vs.                                              Case Number _____

ZOOM VIDEO COMMUNICATIONS, INC., a Delaware corporation,
55 Almaden Boulevard, 6th Floor, San Jose, California 95113,
                                                 Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Harvey Rosenfield
_____                        _Clerk of the Court_
Name of Plaintiff's Attorney

413 E. Capitol St., SE, First Floor              By _____
_____
Address                                                  Deputy Clerk
Washington, D.C. 20003
_____

(310) 392-0522                                   Date _____
_____
Telephone
如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오    የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

CONSUMER WATCHDOG, individually and on behalf of the general public,
413 E. Capitol St., SE, First Floor, Washington, D.C. 20003 Demandante

contra

ZOOM VIDEO COMMUNICATIONS, INC., a Delaware corporation,       Número de Caso: _____
55 Almaden Boulevard, 6th Floor, San Jose, California 95113,

Demandado

**CITATORIO**

Al susodicho Demandado:

    Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

    A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Harvey Rosenfield                                                        *SECRETARIO DEL TRIBUNAL*
_____
Nombre del abogado del Demandante

413 E. Capitol St., SE, First Floor                    Por: _____
_____                                Subsecretario
Dirección
Washington, D.C. 20003

(310) 392-0522                                        Fecha _____
_____
Teléfono

如需翻譯,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bản dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

    Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

CONSUMER WATCHDOG

Vs.                                                    C.A. No.        2020 CA 003516 B

ZOOM VIDEO COMMUNICATIONS, INC.

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.

No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge SHANA FROST MATINI
Date:  August 11, 2020
Initial Conference: 9:30 am, Friday, November 13, 2020
Location:    Courtroom 517
             500 Indiana Avenue N.W.
             WASHINGTON, DC  20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

CAIO-60